IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
_____

CARL A. DIMPERIO, JR.,

                          Plaintiff,           Civil Action No.
                                               9:13-CV-1202 (GTS/DEP)

        v.

ONONDAGA COUNTY, *et al.*,

                          Defendants.
_____

APPEARANCES:                                   OF COUNSEL:

FOR PLAINTIFF:

CARL A. DIMPERIO, JR., *Pro Se*
7087 Buckley Road
Liverpool, NY 13088

FOR DEFENDANT ONONDAGA
COUNTY:

SMITH, SOVIK, KENDRICK                         DANIEL R. RYAN, ESQ.
& SUGNET, P.C.
250 South Clinton Street
Suite 600
Syracuse, NY 13202


DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Carl Dimperio, Jr., a former inmate confined in the Onondaga County Justice Center ("OCJC"), commenced this action against Onondaga County ("County"), Jack Vitvitsky, a physician's assistant stationed at the OCJC, and seven other individuals, pursuant to 42 U.S.C. § 1983, alleging that defendants deprived him of his civil rights by, *inter alia*, denying him certain medication for a serious medical condition in violation of his rights under the Eighth Amendment, and the New York State Constitution. Plaintiff's medical indifference claims relate to treatment of a heart condition that pre-dated his confinement at the OCJC.

Currently pending before the court is a motion brought by defendant County seeking the entry of summary judgment dismissing plaintiff's claims asserted against it based on the absence of any record evidence that any municipal actor deliberately and maliciously denied plaintiff medical treatment while he was confined in the OCJC, and, in any event, the lack of any evidence to suggest that the County has promulgated or maintained a policy or custom through which a municipal actor violated any of plaintiff's constitutional rights. For the reasons set forth below, I recommend that defendant's motion be granted.

I.    <u>BACKGROUND</u>[1]

On August 11, 2011, plaintiff was arrested for selling drugs and was thereafter incarcerated at the OCJC, located in Syracuse, New York, and operated by defendant County. Dkt. No. 1 at 69; Dkt. No. 35-11 at 39-40. Although he has since been released from custody, at all times relevant to this action, plaintiff was confined at the OCJC. *See generally* Dkt. No. 1.

Prior to his arrest, plaintiff suffered a heart attack in February 2011, for which he underwent triple bypass surgery. Dkt. No. 1 at 6, 71, 72; Dkt. No. 38-3 at 110-11. Subsequent to that surgery, plaintiff was prescribed several medications, the "most critical" of which was metoprolol tartrate, a "beta adrenergic blocker." Dkt. No. 1 at 6, 41; Dkt. No. 38-3 at 109.

Shortly after his arrival at the OCJC, plaintiff was interviewed by a nurse who completed a form entitled "INITIAL NURSING SCREENING FORM." Dkt. No. 1 at 46-47; Dkt. No. 35-11 at 98; Dkt. No. 35-13 at 23-25; Dkt. No. 35-14 at 1; Dkt. No. 38-3 at 4-7. Plaintiff contends that he told the nurse at that time that he was on several prescription medications, including some for his heart condition. Dkt. No. 1 at 8; Dkt. No. 35-11 at 99-100. While the form reflects that plaintiff was taking medication, it listed the type of

---

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

medications as "unknown" because plaintiff could not recall the names of the specific medications at the time of booking. Dkt. No. 1 at 8, 47; Dkt. No. 35-11 at 100; Dkt. No. 35-14 at 1; Dkt. No. 38-3 at 7. Plaintiff did, however, tell the nurse interviewing him the name of his doctor and the pharmacy at which he fills his prescriptions. Dkt. No. 1 at 8; Dkt. No. 35-11 at 100; Dkt. No. 38-3 at 7.

Plaintiff alleges that, notwithstanding the fact that he asked every nurse he saw while at the OCJC, between the date of his arrival until September 16, 2011, about being provided medication for his heart condition, all responded that they did not have any information. *See, e.g.,* Dkt. No. 35-11 at 113-14. At his deposition in connection with this matter, plaintiff was only able to identify one specific date – September 1, 2011 – on which a medical care professional at the OCJC, defendant Vitvitsky, a certified physician's assistant, refused to provide him information regarding his medications because, at the time, Vitvitsky was only authorized to undertake a routine physical examination of plaintiff. *Id.* at 192-93. Aside from that instance, plaintiff testified that he could not recall any specific date on which a medical provider denied plaintiff information about receiving his heart medication. *Id.* at 113-14.

On September 15, 2011, plaintiff submitted a sick call request complaining of chest pains similar to those he experienced before he had a heart attack earlier in the year. Dkt. No. 1 at 61; Dkt. No. 35-11 at 149-50. Plaintiff was seen by a doctor at the OCJC, who, after an examination, determined that he should be admitted to the hospital. Dkt. No. 1 at 26; Dkt. No. 35-11 at 152-53. Although subsequent medical testing did not show "any acute infarcts," plaintiff alleges that he "had some sort of minor heart attack" as a result of not being provided his medication for his heart condition between August 11, 2011 and September 15, 2011. Dkt. No. 1 at 26.

## II.   PROCEDURAL HISTORY

Plaintiff commenced this action on or about September 26, 2013, with the filing of a complaint and an accompanying application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. Although plaintiff's complaint names several individuals, as well as Onondaga County, as defendants, following an initial review of the complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A, District Judge Glenn T. Suddaby dismissed all claims asserted against all defendants, with the exception of plaintiff's deliberate medical indifference claim against defendants County, Vitvitsky, and the individuals identified as "Nurse h" and "Nurse i." *See generally* Dkt. No. 7. Judge

Suddaby also granted plaintiff's request for IFP status and denied plaintiff's motion for the appointment of *pro bono* counsel, which plaintiff had submitted at the time he commenced the action. *Id.*

While service upon defendant County was executed on April 4, 2014, Dkt. No. 9, the summons issued to defendant Vitvitsky was returned as unexecuted on May 20, 2014. Dkt. No. 14. The court thereafter reissued the summons, on May 21, 2014, but it was again returned unexecuted on June 4, 2014. Dkt. No. 18. The next day, the court issued a text order indicating that attempts to execute personal service upon defendant Vitvitsky had failed because he does not work at the OCJC. Dkt. No. 19. The court's text order then "put [plaintiff] on notice that if he wishe[d] to pursue his claims against this defendant, . . . he must ascertain an address for this party from defendants' counsel through pretrial discovery." *Id.*

Because plaintiff had not yet served defendant Vitvitsky as of February 24, 2015, the court issued an order to show cause on that date why he should not be dismissed. Text Order to Show Cause Dated Feb. 24, 2015. On March 12, 2015, plaintiff responded to the court's order, arguing that defendant Vitvitsky should not be dismissed because he was under the impression that counsel for defendant County represented defendant Vitvitsky. *See generally* Dkt. No. 43. The court held a telephone conference

regarding the matter on March 30, 2015, in which plaintiff was reminded that, because defendant Vitvitsky and the remaining two "Doe" defendants ("Nurse h" and "Nurse i") are not employed by or agents of defendant County, the county does not have within their possession, custody, or control any information for locating and serving these individuals.[2] Text Minute Entry Dated Mar. 30, 2015. Plaintiff thereafter requested that subpoenas be issued by the court to Staff Care, Inc., for the purpose of attempting to discern whether it employs defendant Vitvitsky, Nurse h, and Nurse i. Dkt. No. 46. The court denied plaintiff's request on April 24, 2015, in light of plaintiff's failure to provide the court with prepared subpoenas and because plaintiff had requested the United States Marshals to serve the subpoenas, an accommodation not available to plaintiff, as directed earlier by the court in the telephone conference on March 30, 2015. Dkt. Nos. 47, 51.

On December 23, 2014, defendant County filed a motion for summary judgment seeking dismissal of the deliberate medical indifference claim asserted against it based on multiple grounds, including that the record

---

[2] During the telephone conference, counsel for defendant County explained that it contracted for prison medical services with a company identified as Correctional Medical Care, Inc., which would occasionally utilize temporary staff from another company. For this reason, none of the nurses or personnel that worked in the medical unit at the OCJC at the relevant times were employed by defendant Onondaga County. This explanation is consistent with the information provided by the defendant to plaintiff during discovery. *See* Dkt. No. 43 at 36-37.

evidence fails to give rise to a genuine dispute of material fact regarding whether the county promulgated a policy or custom through which any municipal actor violated plaintiff's constitutional rights. *See generally* Dkt. No. 35-24. Plaintiff has since filed his response in opposition to the motion, and defendant County has submitted a reply in further support of the motion. Dkt. Nos. 38, 39, 41. Defendant's motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Legal Standard Governing Motions for Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at

248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment

appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.   Plaintiff's *Monell* Claim Asserted Against Defendant Onondaga County

Plaintiff has asserted a deliberate medical indifference claim against defendants Onondaga County, Vitvitsky, Nurse h, and Nurse i arising from allegations that they deliberately and maliciously deprived him of certain medication prescribed for his heart condition while he was confined in the OCJC between August 11, 2011, and September 15, 2011. *See generally* Dkt. No. 1. Defendant County contends that this cause of action, which amounts to a *Monell* claim as it relates to the county, should be dismissed based on the absence of any admissible evidence from which a reasonable factfinder could conclude that it promulgated a policy or custom that resulted in a violation of plaintiff's constitutional rights. Dkt. No. 35-24 at 18-22.

A municipal entity may be held accountable for a constitutional violation that has occurred pursuant to "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers . . . [or] pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell v. Dep't of Soc. Servs. of City of*

10

*N.Y.*, 436 U.S. 658, 690-91 (1978). Municipal liability can be established in various ways, including through "proof of an officially adopted rule or widespread, informal custom[] [demonstrating] 'a deliberate government policy or failing to train or supervise its officers.'" *Bruker v. City of N.Y.* 337 F. Supp. 2d 539, 556 (S.D.N.Y. 2004) (quoting *Anthony v. City of N.Y.*, 339 F.3d 129, 140 (2d Cir. 2003)). A plaintiff may also show that the allegedly unconstitutional action was "taken or caused by an official whose actions represent an official policy," *Jeffes v. Barnes,* 208 F.3d 49, 57 (2d Cir. 2000), or when municipal officers have acquiesced in or condoned a known policy, custom, or practice that violates federal law. *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004); *see also Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) ("*Monell*'s policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions."). A municipality's failure to act "satisfies the policy or custom requirement only where the need to act is so obvious, and the inadequacy of current practices [is] so likely to result in a deprivation of federal rights[] that the municipality . . . can be found deliberately indifferent to the need." *Reynolds*, 506 F.3d at 192 (citing *City of Canton, Ohio v.*

*Harris*, 489 U.S. 378, 390 (1989)). Assuming a plaintiff can prove that a municipality has acquiesced to a pattern of conduct that may result in a violation of federal law, "for liability to attach . . .[,] the identified deficiency . . . must be closely related to the ultimate injury." *City of Canton*, 489 U.S. 391; *accord, Amnesty Am.*, 361 F.3d at 130 ("*City of Canton* requires that plaintiffs establish not only that the officials' purported failure to train occurred under circumstances that could constitute deliberate indifference, but also that plaintiffs identify a specific deficiency in the city's training program and establish that . . . it actually caused the constitutional deprivation." (quotation marks omitted)).

In this case, plaintiff contends that defendant County has promulgated a custom of acquiescing to violations of county policies and procedures related to the intake process at the OCJC. Dkt. No. 38-1 at 23. In support of this position, plaintiff has provided the court with three reports from the New York State Commission of Correction ("Commission of Correction") that concern three incidents that occurred at the OCJC in 2008, 2009, and 2010. *Id.* at 24-25; Dkt. No. 38-4 at 13-31, 38-43. Although these reports conclude that individuals acting on behalf of defendant County violated rules and policies in connection with the incidents, none of which involve plaintiff, there is no common thread among the violations cited and, even liberally

construed, they do not reflect a widespread practice of municipal actors violating county rules, procedures, or policies. In particular, although plaintiff maintains that these incidents reflect a pattern of violating written procedures concerning the intake process at the OCJC, Dkt. No. 38-1 at 24, the reports to do not support this contention.[3] A summary of each of the final reports follows below.

The first incident occurred on November 2, 2008, when Michael Tew committed suicide while in the custody at the OCJC. Dkt. No. 38-4 at 39. According to the final report generated by the Commission of Correction, the two sheriff deputies on duty at the relevant times – the names of whom have been redacted in the version of the report provided by plaintiff – violated, *inter alia*, 9 N.Y.C.R.R. § 7003.2(a), which states, in pertinent part, as follows:

---

[3]     Plaintiff contends that a fourth incident allegedly occurred at the OCJC in January 2010, involving a man named Michael Thoreck, that also demonstrates "another intake issue." Dkt. No. 38-1 at 25. In support of this argument, plaintiff has adduced a news article from an online media outlet, Dkt. No. 38-4 at 44-48, which does not constitute competent evidence for purposes of a motion for summary judgment. *See, e.g., Jackson v. Jimino*, 506 F. Supp. 2d 105, 113 (N.D.N.Y. 2007) ("[H]earsay, and news articles in particular, which are being offered for the truth asserted are inadmissible to defeat a motion for summary judgment." (citing cases)). Accordingly, I have not taken the evidence or plaintiff's arguments with respect to this alleged incident into consideration when analyzing plaintiff's claim against defendant County.

(a) **Supervisory visit** shall mean:

> (1) a personal visual observation of each individual prisoner by facility staff responsible for the care and custody of such prisoners to monitor their presence and proper conduct; and

> (2) a personal visual inspection of each occupied individual prisoner housing unit and the area immediately surrounding such housing unit by facility staff responsible for the care and custody of prisoners to ensure the safety, security and good order of the facility.

9 N.Y.C.R.R. § 7003.2(a); Dkt. No. 38-4 at 42. According to the report, one of the deputies also violated 9 N.Y.C.R.R. § 7003.5(a), which states as follows:

> (a) Prisoner population counts shall:

> > (1) be conducted at the completion and commencement of each regularly scheduled shift;

> > (2) be conducted by the facility staff member completing such regularly scheduled shift;

> > (3) be conducted by the facility staff member beginning the next regularly scheduled shift[.]

9 N.Y.C.R.R. § 7003.5(a)(1)-(3); Dkt. No. 38-4 at 41. The report concluded by recommending to the Onondaga County Mental Health Department that it "review the intake/reception screening of Michael Tew on 10/23/2008

14

[redacted] that he may have also been a risk for suicide attempt during the 2008 incarceration and whether this may have clinical guideline implications." Dkt. No. 38-4 at 43.

The second incident involves the death of Chuniece Patterson, on November 12, 2009, from a ruptured ectopic pregnancy while in the custody of the Onondaga County Sheriff at the OCJC. Dkt. No. 38-4 at 15. The Commission of Correction generated a final report regarding Patterson's death, in which it concluded that two registered nurses who examined Patterson violated two of the OCJC's policies, and one sheriff deputy violated an Onondaga County Sheriff's Office Written Directive. *Id.* at 16, 17, 18, 19. One of the nurses reportedly violated policy #333.0 entitled <u>Vital Signs</u>, and both nurses violated policy #711.00 entitled <u>Documentation</u>. *Id.* at 16, 17, 18. Policy #333.0 provides that

> [v]ital signs will be taken at each scheduled inmate encounter, emergency response, when there is a change in inmate condition, as ordered, and more frequently than ordered if nursing judgment deems it necessary. Any significant changes in vital signs will be reported to the physician by the charge nurse.

*Id.* at 16. Policy #711.00 provides as follows:

> All inmate encounters will be documented in the health record. These encounters include emergency and scheduled encounters with physicians including psychiatrists, NP/PA, nurses, social workers and other ancillary staff. Any observed changes in an

15

inmate's condition shall also be documented.

*Id.* at 17. The sheriff deputy violated the Onondaga County Sheriff's Office Written Directive CUS-052 entitled <u>Health Services</u>, which states that "[s]taff will remain alert for inmates who are too ill to present themselves for sick call and will assist them in obtaining medical care." *Id.* at 19. As a result of this incident, the Commission of Correction directed the Onondaga County Sheriff's Department to (1) review and revise its policies and procedures "for management of inmate pregnancy followed by an in-service education colloquium to the professional nursing staff at the [OCJC]," (2) discipline the sheriff's deputy who supervised Patterson during a certain period of time, (3) "direct the Health Services Division to develop improvements with the communication between the registered nursing staff that are giving and receiving shift report," and (4) monitor the two registered nurses who treated Patterson "for their practice of professional nursing[.]" *Id.* at 20-21.

The third reported incident relates to the death of Raul Pinet on August 6, 2010, from asphyxia during restraint while in the custody of the Onondaga County Sheriff at the OCJC. Dkt. No. 38-4 at 24. In its final report concerning this incident, the Commission of Correction concluded that one of the nurses who responded to Pinet after he arrived at the OCJC violated Onondaga Justice Center Policy CUS-017, <u>Admissions</u>, which gives

medical staff the discretion to determine if a detainee requires immediate

transport to the hospital, by failing to undertake a thorough assessment of

Pinet. *Id.* at 28. The report also concluded that the same nurse violated 9

N.Y.C.R.R. §§ 7010.2(c), (d), which provide as follows:

> (c) Every inmate who at the time of admission
> appears to be physically incapacitated due to drug or
> alcohol intoxication shall be examined immediately
> by a physician.

> (d) Every inmate who at the time of admission
> appears to be intoxicated by alcohol or drugs shall be
> subject to increased supervision as determined
> pursuant to section 7003.3(h) of this Title[.]

9 N.Y.C.R.R. §§ 7010.2(c), (d). The Commission of Correction's report also

concluded that the responding supervisors and officers violated "Minimum

Standards" by "fail[ing] to obtain immediate medical attention for Pinet," who

had exhibited various physical symptoms. Dkt. No. 38-4 at 30. The

Commission of Correction issued directives to the Office of the Sheriff of

Onondaga County to, *inter alia*, (1) review the conduct of the individuals on

staff that were involved in the incident, (2) "implement policy changes and

staff training regarding the risks and dangers of prone restraint and

associated asphyxia," and (3) conduct a joint review with the City of

Syracuse Police Department regarding the "delivery of unarraigned

prisoners to the [OCJC]." *Id.*

As demonstrated above, the reports by the Commission of Correction do not demonstrate a pattern of violating any one rule, procedure, or policy such that a reasonable factfinder could conclude that defendant County has promulgated or maintained a custom of acquiescing to the violations of the rules or procedures discussed in the reports. In addition, contrary to plaintiff's contention, the violations reflected in the reports do not consistently involve the intake process of inmates being admitted to the OCJC. That the reports reflect violations of various rules and procedures more generally also does not suffice for purposes of establishing a *Monell* claim because the three incidents, which occurred over a three-year period and preceded the plaintiff's period of confinement at the OCJC by at least one year, are not "sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware[.]" *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012). In this regard, plaintiff has also failed to establish a genuine dispute of material fact regarding whether – even assuming the three incidents give rise to an inference that the county acquiesced to a widespread pattern of failing to adhere to rules and policies regarding the intake procedures at the OCJC – "a [county] policymaking official was aware of the constitutional injury but [consciously, and not negligently,]

failed to take appropriate action to prevent or sanction violations of constitutional rights." *Jones*, 691 F.3d at 81. Indeed, plaintiff has failed to adduce any proof that defendant County neglected to make any of the changes recommended in the Commission of Correction's final reports subsequent to their issuance or that any failure by the county to make the recommended changes resulted in the alleged inadequate medical treatment plaintiff received while at the OCJC.

Finally, plaintiff's allegations that the absence or disorganization of certain policies – specifically regarding (1) the disciplinary procedures in the event an individual violates county rules or policies, (2) over-the-counter medications, and (3) grievances – are conclusory and speculative. For example, plaintiff contends that the "lack of policy [regarding the administration of over-the-counter medications] opens the door for abuses by staff to be deliberately indifferent to inmates' pain." Dkt. No. 38-1 at 26-27. Plaintiff also "question[s] the efficiency of the county's grievance system" because, based on his analysis, the system is "highly disorganized to the point where individual issues can not [sic] be easily sorted." *Id.* at 27. Plaintiff then concludes that "[t]his would create a condition where no-one [sic] would be able to figure out potentially serious issues that may be endangering the health and safety of inmates." *Id.* These contentions,

however, are not supported by the record evidence and, accordingly, do not give rise to a genuine dispute of material fact with respect to whether defendant County promulgated a custom of failing to adhere to rules and procedures that resulted in a violation of plaintiff's constitutional rights.

For all of these reasons, I recommend that plaintiff's claim against defendant Onondaga County be dismissed.

C.    Defendants Vitvitsky, Nurse h, and Nurse i

As was discussed above in Part II of this report, service of process in this action was never effectuated upon defendants Vitvitsky, Nurse h, or Nurse i. Dkt. Nos. 14, 18; Text Minute Entry Dated Mar. 30, 2015. The federal rule governing service provides that,

> [i]f a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m).[4] As the rule suggests, the period for service may be extended by the court. "[W]here good cause is shown, the court has no choice but to extend the time for service, and the inquiry is ended." *Panaras*

---

[4]      This court's local rules shorten the time for service from the 120-day period under Rule 4(m) to sixty days. N.D.N.Y. L.R. 4.1(b).

*v. Liquid Carbonic Indus. Corp.*, 94 F.3d 338, 340 (7th Cir. 1996). "If, however, good cause does not exist, the court may, in its discretion, either dismiss the action without prejudice or direct that service be effected within a specified time." *Panaras*, 94 F.3d at 340 (citing Fed. R. Civ. P. 4(m)); *see also Zapata v. City of N.Y.*, 502 F.3d 192, 196 (2d Cir. 2007) ("We hold that district courts have discretion to grant extensions even in the absence of good cause."); *Romandette v. Weetabix Co., Inc.*, 807 F.2d 309, 311 (2d Cir. 1986). When examining whether to extend the prescribed period for service, a district court is afforded ample discretion to weigh the "overlapping equitable considerations" involved in determining whether good cause exists and whether an extension may be granted in the absence of good cause. *Zapata*, 502 F.3d at 197.

A plaintiff's *pro se* status entitles him to a certain degree of leniency insofar as service of process is concerned, and courts generally favor resolution of a case on its merits rather than on the basis of a procedural technicality. *Poulakis v. Amtrak*, 139 F.R.D. 107, 109 (N.D. Ill. 1991). When a plaintiff proceeds IFP, as is the case in this instance, the court is obligated to issue the plaintiff's process to the United States Marshal, who must, in turn, effect service upon the defendants, thereby relieving the plaintiff of the burden to serve once reasonable steps have been taken to identify the

defendants named in the complaint. Fed. R. Civ. P. 4(c)(3); 28 U.S.C. §

1915(d); *see also Byrd v. Stone*, 94 F.3d 217, 219 (6th Cir. 1996) ("[Section]

1915([d]) provides that the officers of the court 'shall issue and serve all

process' when a plaintiff is proceeding in forma pauperis."). Of course, this

does not mean that a *pro se* plaintiff may stand idle upon being notified that

efforts by the U.S. Marshals Service to serve a particular defendant have

been unsuccessful. *VanDiver v. Martin*, 304 F. Supp. 2d 934, 938-43 (E.D.

Mich. 2004). A plaintiff who does so acts at his peril and risks dismissal of

his claims against an unserved defendant. As the Second Circuit has

observed,

> [i]f a plaintiff proceeding IFP chooses to rely on the
> Marshals to serve the relevant parties, and it
> becomes apparent that the Marshals will not
> accomplish this by the Rule 4(m) or court-ordered
> deadline, she must advise the district court that she
> is relying on the Marshals to effect service and
> request a further extension of time for them to do so.

*Meilleur v. Strong*, 682 F.3d 56, 63 (2d Cir. 2012). Accordingly, a district

court must look at the facts and circumstances surrounding each case to

determine whether good cause exists to extend the time for service.

*Meilleur*, 682 F.3d at 63.

In this case, plaintiff has been provided ample time and opportunity to

identify, locate, and/or serve defendants Vitvitsky, Nurse h, and Nurse i.

While a summons was issued as to defendant Vitvitsky on April 1, 2014, it was returned unexecuted on May 20, 2014. Dkt. No. 14. A summons was reissued on May 21, 2014, and again returned unexecuted on June 4, 2014. Dkt. Nos. 15, 18. The court thereafter issued the following text order:

> According to the docket sheet, personal service has been attempted upon defendant Jack Vitvitsky, however, the summons was returned as unexecuted indicating that defendant Vitvitsky does not work at the [OCJC]. Dkt. No. 18. Since service of the summons and complaint has not yet been accomplished upon defendant Jack Vitvitsky, the plaintiff is put on notice that if he wishes to pursue claims against this defendant, then he must ascertain an address for this party from defendants' counsel through pretrial discovery.

Dkt. No. 19.

Shortly thereafter, plaintiff filed his first request for an extension of time to amend the complaint and for joinder of parties based on defendant County's alleged failure to provide the necessary information to serve defendants Vitvitsky and Nurse h. *See generally* Dkt. No. 22. Plaintiff acknowledged in his request that "[t]he inclusion of Defendant Jack Vitvitsky and the identification of nurse H are critical in this pursuit of justice and success of this action with regards to the claim of 'Deliberate Indifference,' which is also necessary to show Defendant County's role in the matter." Dkt. No. 22 at 3. The court granted plaintiff's request on August 21, 2014. Dkt.

No. 23.

In his second request for an extension of time to amend and for joinder of parties, plaintiff stated that, "[f]rom [defendant Onondaga County's] response to discovery requests[, which he received on August 22, 2014], [he] was able to make positive identification of who [he] referred to as Nurse h in the Complaint." Dkt. No. 26 at 2. He also acknowledged that defendant Onondaga County informed him that it "do[es] not know where to find or how to get in touch with defendant Jack Vitvitsky [because h]e worked for a temporary employment agency hired by Correctional Medical Care, Inc." *Id.* at 2-3. The court granted plaintiff's request on September 19, 2014. Dkt. No. 27.

Plaintiff's third request for an extension of time to amend his complaint and for joinder of parties was filed on October 23, 2014, the same date as the deadline for discovery. Dkt. No. 28. He estimated that he was "about 75% complete [with drafting an amended complaint] and expect[ed] that [he] should be able to finish within the time period of another extension[.]" *Id.* at 4. Plaintiff did not indicate his progress, if any, on effectuating service of process upon defendants Vitvitsky, Nurse h, or Nurse i. *See generally id.* Plaintiff's request was denied in a text order dated October 24, 2014. Dkt. No. 30.

Plaintiff thereafter filed a request "for late amendment for joinder of parties" on October 28, 2014. Dkt. No. 31. By this date, discovery was closed, defendant Onondaga County had already deposed plaintiff and responded to his discovery demands,[5] and plaintiff had earlier indicated, in his second request for an extension of time for joinder of parties, that he knew the identity of Nurse h as early as August 22, 2014. Dkt. No. 26 at 2; Dkt. No. 29. This request for late joinder was denied by the court, and plaintiff did not appeal the order to the assigned district judge.[6] Dkt. No. 32.

In response to the court's order to show cause why defendant Vitvitsky should not be dismissed, Dkt. No. 42, plaintiff argued that he believed counsel for defendant County represented Vitvitsky. *See generally* Dkt. No. 43. This contention, however, is not credible in light of defendant

---

[5]     Although plaintiff vaguely suggests defendant County intentionally delayed in responding to his discovery demands or intentionally withheld certain information from him, he never filed a motion to compel discovery. *See, e.g.,* Dkt. No. 22 at 2 ("I have sent requests to Counsel for the Defense to obtain information necessary to serve other Defendant's [sic] and as of this day I have not received any response."); Dkt. No. 31 at 1-2 ("There is technically an additional defendant that should have been included into the complaint however was not due to the fact their [sic] identity was being kept hidden intentionally I believe because of an obvious showing for a cause of action.").

[6]     It is worth noting that plaintiff's "late request for amendment for joinder of parties" did not comply with rule 7.1(a)(4) of the local rules of practice for this court and could have been denied on this basis. The rule requires that a motion for joinder of parties, pursuant to Rule 20 of the Federal Rules of Civil Procedure, include the complete proposed amended pleading, "which will supersede the original pleading in all respects." N.D.N.Y. L.R. 7.1(a)(4). Instead of including a complete proposed amended pleading, plaintiff attached only two pages that he requested the court substitute for two pages in his original complaint. Dkt. No. 31 at 4-5.

County's response to one of plaintiff's interrogatories that asked, "Do you know how to reach Jack Vitvitsky, and if so, how or where can he be found?" Dkt. No. 43 at 36. Defendant County responded, "No. Jack Vitvitsky was not an employee of the County. Upon information and belief, the contractor utilized by the County to provide medical services utilized a temp agency known as Staffcare. Vitvitsky was not an employee of the defendant o[r] the contractor." *Id.* at 37. In addition, at the time the second summons for defendant Vitvitsky was returned unexecuted, the court informed plaintiff the failure to serve was because defendant Vitvitsky does not work at the OCJC. Dkt. No. 19. Any contention that plaintiff believed counsel for defendant County represented defendant Vitvitsky is unmistakably belied by the information provided to plaintiff by both the defendant and court.[7]

With respect to defendants Nurses h and i, although there is evidence that plaintiff was aware of the identity of at least one of the defendant-nurses as early as August 22, 2014, he has failed to explain why he chose not to move to join him/her as a party until after discovery closed. Dkt. No. 26 at 1-2.

Based on the record, I find that plaintiff has failed to demonstrate good

---

[7] Plaintiff apparently retained this information to some degree because, in his second request for an extension of time to amend and join parties, he acknowledged that defendant Vitvitsky had been employed by "a temporary employment agency." Dkt. No. 26 at 3.

cause as to why defendants Vitvitsky, Nurse h, and Nurse i have not been served. "Good cause is generally found only in exceptional circumstances where the plaintiff's failure to serve process in a timely manner was the result of circumstances beyond its control. " *E. Refractories Co., Inc. v. Forty Eight Insulations, Inc.*, 187 F.R.D. 503, 505 (S.D.N.Y. 1999) (quotation marks omitted). Because plaintiff was provided ample time and opportunities to locate and serve these individuals but delayed in taking steps to do so until after discovery closed and the dispositive motion deadline expired, I recommend dismissal of defendants Vitvitsky, Nurse h, and Nurse i without prejudice.

IV.  <u>SUMMARY AND RECOMMENDATION</u>

Even assuming an agent of the county deliberately and maliciously denied plaintiff medical treatment for his serious medical condition, no reasonable factfinder could conclude based on the record now before the court that the agent acted pursuant to a custom, promulgated by defendant County, of acquiescence to violations of county rules, procedures, or policies. For that reason, plaintiff's *Monell* claim against defendant County should be dismissed. In addition, because plaintiff has failed to demonstrate good cause for failing to timely serve defendants Vitvitsky, Nurse h, and Nurse i, the claims asserted against them should be dismissed.

Accordingly, it is hereby respectfully

RECOMMENDED that defendant Onondaga County's motion for summary judgment (Dkt. No. 35) be GRANTED and that plaintiff's claims against the county be DISMISSED; and it is further

RECOMMENDED that the claims asserted against defendants Jack Vitvitsky and Jane Does (Nurse h and Nurse i) be dismissed without prejudice.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     August 14, 2015
            Syracuse, New York

David E. Peebles
U.S. Magistrate Judge